No. 76,524

KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM, *Appellee*, v.
REIMER & KOGER ASSOCIATES, INC., *et al.*, *Appellants*.
(941 P.2d 1321)

636

Opinion filed June 27, 1997.

*Robert L. Howard*, of Foulston & Siefkin, L.L.P., of Wichita, argued the cause, and *Timothy B. Mustaine*, of the same firm, was with him on the briefs for appellant Fran Jabara.

*Thomas P. Sullivan*, of Jenner & Block, of Chicago, Illinois, argued the cause, and *David P. Sanders* and *David A. Schwartz*, of the same firm; *J. Paul Oetken*, of Jenner & Block, of Washington, D.C.; and *Elizabeth Drill Nay*, of Lewis, Rice & Fingersh, L.C., of Kansas City, Missouri, were with him on the briefs for appellants Brown, Koralchik & Fingersh; Lewis, Rice & Fingersh, L.C.; Jacob Brown; Robert J. Campbell; William E. Carr; Peter M. DiGiovanni; Jack N. Fingersh; Alan G. Keith; Charles F. Miller; C. Robert Monroe; and H. Boone Porter, III.

*Anne Lamborn Baker* and *Thomas E. Wright*, of Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., of Topeka, were on the briefs for appellants Cohen, Brame & Smith, P.C., and Roger C. Cohen.

*David J. Waxse* and *Timothy M. O'Brien*, of Shook, Hardy & Bacon, L.L.P., of Overland Park, and *John K. Villa*, *Mary G. Clark*, and *Eric A. Kuhl*, of Williams

& Connolly, of Washington, D.C., were on the briefs for appellants Shook, Hardy & Bacon; defendant partners of Shook, Hardy & Bacon; and Shook, Hardy & Bacon, P.C.

*Karen D. Wedel* and *R. Frederick Walters*, of Walters, Bender & Strohbehn, P.C., of Kansas City, Missouri, were on the briefs for appellants Linde Thomson Langworthy Kohn & Van Dyke, P.C., and Thomas W. Van Dyke.

*Heather S. Woodson*, of Stinson, Mag & Fizzell, P.C., of Overland Park, and *Lawrence M. Berkowitz* and *John C. Aisenbrey*, of the same firm of Kansas City, Missouri, were on the briefs for appellants GKB, Inc., William D. Thomas, and G. Kenneth Baum.

*Gregory F. Maher* and *Brian G. Boos*, of Yeretsky & Maher, L.L.C., of Kansas City, Missouri, and *Kathleen A. Hardee*, of Gilliland & Hayes, P.A., of Kansas City, Missouri, were on the briefs for appellants Reimer & Koger Associates, Inc., Kenneth H. Koger, Brent Messick, and Edward Hart.

*Marc K. Erickson*, of Lathrop & Gage L.C., of Overland Park, and *Timothy K. McNamara*, of Kansas City, Missouri, were on the brief for appellant Frank L. Victor.

*Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka; *Steven D. Ruse*, of Shughart, Thomson & Kilroy, P.C., of Overland Park; and *R. Lawrence Ward*, *Russell S. Jones, Jr., and Richard M. Paul III*, of Shughart, Thomson, & Kilroy, P.C., of Kansas City, Missouri, were on the briefs for appellants Blackwell Sanders Matheny Weary & Lombardi and Kutak Rock.

*Frank M. Rice*, of Schroer, Rice, P.A., of Topeka, argued the cause, and *Gene E. Schroer* and *Charles D. McAtee*, of the same firm; *Eugene I. Pavalon* and *Geoffrey L. Gifford*, of Pavalon & Gifford, of Chicago, Illinois; *Bess Schenkier* and *Timothy K. McPike*, of KPERS Litigation Group, of Chicago, Illinois; *Robert F. Coleman, Eugene J. Schlitz*, and *Kenneth Philip Ross*, of Robert F. Coleman & Associates, of Chicago, Illinois; and *Robin R. LaFollette, James L. Ungerer*, and *Donald H. Loudon, Jr.*, of KPERS Litigation Group, of Shawnee Mission, were on the brief for appellee Kansas Public Employees Retirement System.

*Thomas L. Theis, Jeffrey W. Jones*, and *Gregory J. Bien*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C., of Topeka, were on the brief for *amicus curiae* Hershberger, Patterson, Jones & Roth, L.L.C.

The opinion of the court was delivered by

LARSON, J.: These 10 combined interlocutory appeals arise out of 5 of the numerous pending cases filed by the Kansas Public Employees Retirement System (KPERS) against a number of individuals, accounting firms, and law firms to recover amounts lost in KPERS's direct placement investment programs.

The defendants filed motions for summary judgment, alleging KPERS's claims were barred by the statute of limitations. The issue submitted was limited to which, if any, statute of limitations applies to KPERS's claims arising from its investment activities.

The trial court denied the defendants' motions, holding that KPERS's investment activity is a governmental and not a proprietary function, and, as such, no statute of limitations applies. It also held that if a period of limitations did apply, K.S.A. 60-522, which established a 10-year statute of limitations on any claims brought by KPERS, applies retroactively to revive any time-barred claims. The order was certified for an interlocutory appeal and accepted pursuant to K.S.A. 60-2102(b). We have jurisdiction under K.S.A. 20-3018(c).

*Factual background*

The five cases from which these appeals arise are as follows:

1. In *KPERS v. Reimer & Koger Assocs., Inc.*, 93 CV 588, KPERS sued its investment advisor, Reimer & Koger Associates, Inc., (Reimer & Koger) for about $14.2 million in losses from investments made in Tallgrass Technologies Corporation. The suit was filed on May 20, 1993, for the investment course followed by Reimer & Koger starting in 1985.

2. In *KPERS v. Russell, et al.*, 93 CV 389, KPERS sued to recover about $7.85 million from investments made in Emblem Graphics Systems and Emblem Tape & Label Corporation (Emblem) from September 1985 to December 1988. KPERS alleged that various defendants intentionally assisted Reimer & Koger and Michael Russell, then a KPERS board member, to breach their duties to KPERS. These defendants include Frank L. Victor, a former director of a creditor of Emblem; the George K. Baum Company, Emblem's investment banking consulting service; George K. Baum and William D. Thomas, officers and directors of both Emblem and the Baum Company; Linde Thomson Langworthy Kohn & Van Dyke, a law firm alleged to have represented Emblem, KPERS, and Reimer & Koger; and Blackwell Sanders Matheny Weary &

Lombardi, a law firm alleged to have been retained by Reimer & Koger to represent KPERS's interests in the Emblem transactions.

3. In *KPERS v. Ward, et al.*, 92 CV 433A, KPERS sued to recover about $4.425 million invested in Affinity Systems, Inc., (Affinity) from November 1987 to August 1990. KPERS alleged securities fraud and participation in a breach of trust. This suit was filed in 1992, but in 1995, KPERS moved to amend its petition to add claims against other parties, including Fran Jabara, who was alleged to have been Affinity's director.

4. In *KPERS v. Byrd, et al.*, 92 CV 923, KPERS sought to recover about $2.5 million for investments made from April 1985 to April 1987 in the Hydrogen Energy Corporation (Hydrogen). KPERS initially sued in 1992, but an amended petition filed in 1994 added as defendants the law firms of Lewis, Rice & Fingersh a/k/a Brown, Koralchik & Fingersh, and Shook, Hardy & Bacon, alleging that they had breached their duties to KPERS after being retained to represent KPERS's interests in the Hydrogen investments.

5. In *KPERS v. Cohen, Brame & Smith, et al.*, 92 CV 805, KPERS filed suit to recover for investment losses of $6.38 million in Sharoff Food Services, Inc. (Sharoff). KPERS claimed that Cohen, Brame & Smith, a law firm representing Sharoff, issued false opinion letters, thereby participating in Reimer & Koger's breach of its duties to KPERS. KPERS amended its petition in 1996 to add claims against Kutak Rock, which allegedly represented KPERS in the Sharoff investments between April 1987 to June 1987. On February 12, 1993, the trial court ruled against Cohen, Brame & Smith's motion for summary judgment on grounds similar to the consolidated rulings of April 3, 1996, on appeal before us now. The trial court, however, on June 10, 1996, amended its order of April 3, 1996, in order to allow Cohen, Brame & Smith to join in the interlocutory appeal regarding its statute of limitations defense.

Each defendant filed summary judgment motions which essentially contended KPERS's tort and statutory claims are barred under the general statutes of limitations of K.S.A 60-512 and K.S.A. 60-513. The parties framed the issues in such a manner that the

trial court was not asked to determine any question of fact as to when the claims accrued. Rather, the trial court was asked to decide whether KPERS's claims arose out of a proprietary function so that the general statute of limitations would apply pursuant to K.S.A. 60-521. Further, the court also considered the applicability and constitutionality of K.S.A. 60-522, enacted in 1992 to grant KPERS a 10-year statute of limitations and amended in 1993 "to be construed and applied retroactively."

On April 3, 1996, the trial court ruled in favor of KPERS on all questions regarding the limitations defenses. The trial court's decision reaffirmed a prior decision of August 21, 1992, in an earlier filed KPERS case, *KPERS v. Reimer & Koger Assocs., Inc., et al.,* 91 CV 786 *(Home Savings)*, which was removed by the Resolution Trust Corporation to the United States District Court for the Western District of Missouri. Before removal, the Kansas trial court determined KPERS's claims arose from a governmental rather than a proprietary function, so that general statutes of limitations did not apply to its claims pursuant to K.S.A. 60-521.

After removal, however, the United States District Court determined KPERS's claims in *Home Savings* arose out of a proprietary function. But, the newly enacted K.S.A. 60-522, which granted KPERS a 10-year statute of limitations, was held to apply to KPERS's claims, so the claims were not time barred. *KPERS v. Reimer & Koger (Home Savings)*, 92-0922-CV-W-9, filed May 3, 1994.

On appeal, the Eighth Circuit Court of Appeals reversed, finding that K.S.A. 60-522 was not intended to apply retroactively to revive previously time-barred claims. *Kansas Pub. Emp. Retirement v. Reimer & Koger (Home Savings)*, 61 F.3d 608, 614-16 (8th Cir. 1995). In a later appeal, the Eighth Circuit determined that KPERS's investment activities were proprietary. *Kansas Pub. Emp. Retirement v. Reimer & Koger (Home Savings)* (No. 96-3262, filed May 13, 1997).

Reimer & Koger was named a defendant in the *Home Savings* case. Two of the other defendants in the current cases below, Shook, Hardy & Bacon and Blackwell Sanders Matheny Weary & Lombardi were permitted, over KPERS's objection, to intervene

in the *Home Savings* case while the appeal to the Eighth Circuit was pending.

Irrespective of the federal courts' Home Savings decisions, the state trial court in the present cases reaffirmed its holding from *Home Savings,* and then went on to analyze the impact of the subsequent enactment of K.S.A. 60-522. The court stated the statute was enacted to remove the uncertainty of applying K.S.A. 60-521 to KPERS's claims as reflected by the varying interpretations by the state and federal district courts. The court ruled that K.S.A. 60-522 applied retroactively to claims that may have been time barred and established a period of limitations that did not heretofore exist. The court held that the retroactive application of 60-522 to revive what may have been time-barred claims was not unconstitutional. The court concluded by declaring that the doctrine of collateral estoppel did not bar redetermination of these matters.

It is from these rulings that the numerous defendants in the KPERS cases appeal.

*Issues presented to the court:*

1. Do KPERS's claims arise out of a proprietary function so that the general statutes of limitation apply as directed by K.S.A. 60-521?

2. Is KPERS collaterally estopped from relitigating the application and interpretation of K.S.A. 60-521 and 60-522 against all defendants?

3. Is K.S.A. 60-522 unconstitutional under either the United States or the Kansas Constitutions for the following reasons?

    A. Does the statute violate equal protection?
    B. Does the statute violate due process?
    C. Was the statute enacted in violation of the single bill subject provision of Article 2, § 16 of the Kansas Constitution?

4. Does K.S.A. 60-522 revive claims previously time barred?

5. Are any of the defendants employees of KPERS so that if KPERS's claims arise from a proprietary function, K.S.A. 60-521

would prevent the statute of limitations from applying to KPERS's claims?

Because of the result we reach, several of the issues raised are of limited applicability. However, we will consider the distinction between proprietary and governmental functions in detail and will address the collateral estoppel argument. We will treat the remaining issues somewhat summarily.

*Standard of review*

Although the issues were initially raised by summary judgment motions, our standard of review of such rulings is not applicable here. The parties have appealed what are clearly only questions of law without any agreed or existing factual determinations. As such, we concur with the parties' contention that these are questions of law and of statutory construction over which we have unlimited review. See *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 716, 924 P.2d 1239 (1996).

Before beginning our analysis of the issues raised, which are in part based upon interpretation of the applicable statutes, we again restate certain basic rules of statutory construction set forth in *Todd v. Kelly*, 251 Kan. 512, 515-16, 837 P.2d 381 (1992), by which we are bound:

"Interpretation of statutes is a question of law. The function of the court is to interpret the statutes, giving the statutes the effect intended by the legislature. *State ex rel. Stephan v. Kansas Racing Comm'n*, 246 Kan. 708, 719, 792 P.2d 971 (1990).

'As a general rule, statutes are construed to avoid unreasonable results. *Wells v. Anderson*, 8 Kan. App. 2d 431, 659 P.2d 833, *rev. denied* 233 Kan. 1093 (1983). There is a presumption that the legislature does not intend to enact useless or meaningless legislation. *In re Adoption of Baby Boy L.*, 231 Kan. 199, Syl. ¶ 7, 643 P.2d 168 (1982).' *City of Olathe v. Board of Zoning Appeals*, 10 Kan. App. 2d 218, 221, 696 P.2d 409 (1985).

'A construction of a statute should be avoided which would render the application of a statute impracticable or inconvenient, or which would require the performance of a vain, idle, or futile thing, or attempt to require the performance of an impossible act.' *In re Adoption of Baby Boy L.*, 231 Kan. 199, Syl. ¶ 8, 643 P.2d 168 (1982). See 73 Am. Jur. 2d, Statutes § 251.

'In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act

and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible.' *In re Marriage of Ross*, 245 Kan. 591, 594, 783 P.2d 331 (1989).

'[T]he court must give effect to the legislature's intent even though words, phrases or clauses at some place in the statute must be omitted or inserted.' *Ross*, 245 Kan. at 594.

'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act, but are required to consider and construe together all parts thereof *in pari materia*. . . .' *Kansas Commission on Civil Rights v. Howard*, 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 (1975)."

### Arguments and authorities

We begin our analysis of the first and most important issue raised, subject to the scope of review stated and the rules of construction recognized.

### Governmental or proprietary function

The fundamental issue we must decide, which was almost totally ignored by the federal court decisions available to the trial court, is whether the investment activity of KPERS is a governmental function or a proprietary function.

In commencing this analysis, we begin by setting forth a brief history of KPERS and its purposes, directives, and obligations. In *Shapiro v. Kansas Public Employees Retirement System*, 211 Kan. 452, 455, 457, 507 P.2d 281 (1973), we recognized that KPERS was established in 1961 by K.S.A. 74-4901 *et seq.* and its purposes have remained unaltered to date:

"The purpose of this act is to provide an orderly means whereby employees of the participating employers who have attained retirement age as herein set forth may be retired from active service without prejudice and without inflicting a hardship upon the employees retired and to enable such employees to accumulate reserves for themselves and their dependents to provide for old age, death and termination of employment, and for the purpose of effecting economy and efficiency in the administration of governmental affairs." K.S.A. 74-4901.

Another provision of the act further states:

"There is hereby created the 'Kansas public employees retirement system' which shall be a body corporate and instrumentality of the state of Kansas. The system shall be vested with the powers and duties specified in this act and such other powers as may be necessary or proper to enable it, its officers, employees

and agents to carry out fully and effectively the purposes and intent of this act." K.S.A. 74-4903.

The right to sue and be sued exists in the act pursuant to K.S.A. 1996 Supp. 74-4904(1): "The system may sue and be sued in its official name, but its trustees, officers, employees and agents shall not be personally liable for acts of the system unless such person acted with willful, wanton or fraudulent misconduct or intentionally tortious conduct."

KPERS is governed by a board of trustees as provided in K.S.A. 1996 Supp. 74-4905. Participating employers are provided for in K.S.A. 1996 Supp. 74-4910. Eligible employees are designated in K.S.A. 1996 Supp. 74-4911. The normal retirement date for a member of the system is set forth in K.S.A. 1996 Supp. 74-4914. Retirement benefits are described in K.S.A. 1996 Supp. 74-4915. Payments of accidental death benefits and accumulated contributions upon death are included in K.S.A. 1996 Supp. 74-4916. Retirement benefits options are set forth in K.S.A. 1996 Supp. 74-4918. Employer contributions to the fund are required by K.S.A. 1996 Supp. 74-4920 from the employers of all fund members. Provisions for the investment of the fund are found in K.S.A. 1996 Supp. 74-4921, which reads:

"(1) There is hereby created in the state treasury the Kansas public employees retirement fund. All employee and employer contributions shall be deposited in the state treasury to be credited to the Kansas public employees retirement fund. The fund is a trust fund and shall be used solely for the exclusive purpose of providing benefits to members and member beneficiaries and defraying reasonable expenses of administering the fund. Investment income of the fund shall be added or credited to the fund as provided by law. All benefits payable under the system, refund of contributions and overpayments, purchases or investments under the law and expenses in connection with the system unless otherwise provided by law shall be paid from the fund. . . .

"(2) The board shall have the responsibility for the management of the fund and shall discharge the board's duties with respect to the fund solely in the interests of the members and beneficiaries of the system for the exclusive purpose of providing benefits to members and such member's beneficiaries and defraying reasonable expenses of administering the fund and shall invest and reinvest moneys in the fund and acquire, retain, manage, including the exercise of any voting rights and disposal of investments of the fund within the limitations and according to the powers, duties and purposes as prescribed by this section.

"(3) Moneys in the fund shall be invested and reinvested to achieve the investment objective which is preservation of the fund to provide benefits to members and member beneficiaries, as provided by law and accordingly providing that the moneys are as productive as possible, subject to the standards set forth in this act. No moneys in the fund shall be invested or reinvested if the sole or primary investment objective is for economic development or social purposes or objectives.

"(4) In investing and reinvesting moneys in the fund and in acquiring, retaining, managing and disposing of investments of the fund, the board shall exercise the judgment, care, skill, prudence and diligence under the circumstances then prevailing, which persons of prudence, discretion and intelligence acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims by diversifying the investments of the fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and not in regard to speculation but in regard to the permanent disposition of similar funds, considering the probable income as well as the probable safety of their capital."

Under KPERS's statutory provisions, contributions are made by both employees and employers, but our cases have uniformly held that employees' retirement, disability, and death benefits are contractual in nature between the state and the employee members of the system. In *Shapiro*, 216 Kan. 353, Syl. ¶ 1, we held: "State retirement systems create contracts between the state and its employees who are members of the system." In *Brazelton v. Kansas Public Employees Retirement System*, 227 Kan. 443, Syl. ¶ 4, 607 P.2d 510 (1980), we stated: "Retirement benefits are a valuable part of the consideration for entering into and continuing in public service and a participating member of a governmental pension system has certain vested rights in the pension plan."

In addition, *Brazelton* stated:

"Public employment seldom pays as much as a comparable job in the private sector. A pension to be received upon retirement is a prime inducement in securing qualified workers and avoiding the expense of a high turnover rate. Retirement benefits are a valuable part of the consideration for entering into and continuing in public service. A member of a governmental pension system has certain vested rights in the pension plan because it is a vital part of the consideration for entering into and performing under the employment contract." 227 Kan. at 449.

It is clear that fully vested benefits payable to retired or disabled employees or their beneficiaries are contractual obligations of the

State. KPERS is a classic "defined benefit" retirement plan. See K.S.A. 1996 Supp. 74-4920. The State of Kansas and the numerous public entities whose employees are subject to the plan have an unequivocal constitutional, statutory, and contractual obligation to ensure that KPERS has sufficient funds to pay the defined benefits to public employees who are participating in the plan. See *Brazelton*, 227 Kan. at 447-48. Additionally, K.S.A. 1996 Supp. 74-4923(a) reads: "No alteration, amendment or repeal of this act shall affect the then existing rights of members and beneficiaries but shall be effective only as to rights which would otherwise accrue under this act as a result of services rendered by an employee after the alteration, amendment or repeal." K.S.A. 1996 Supp. 74-4920(2) further directs:

"The division of the budget and the governor shall include in the budget and in the budget request for appropriations for personal services the sum required to satisfy the state's obligation under this act as certified by the board and shall present the same to the legislature for allowance and appropriation."

If the State of Kansas and involved local entities of government do not adequately fund KPERS, they would be liable for breach of contract and will have violated both the KPERS Act and the constitutional prohibition against impairment of contracts. See Article 1, § 10 of the United States Constitution.

Yet, the success or failure of KPERS' investments does not affect the employees' contributions. These contributions are fixed percentages of their salaries, entitling employees to certain defined benefits. K.S.A. 74-4919. Employee benefits could not be reduced to cover any underfunding of KPERS, nor could employees be forced to contribute more to pay for their already vested benefits.

The defendants' argument that KPERS's investments benefit only members and not taxpayers is clearly erroneous. The beneficiaries of KPERS's investments activities are not KPERS members and beneficiaries, but rather Kansas taxpayers and the taxpayers of hundreds of public entities throughout the state who provide retirement plans to their employees through KPERS's provisions.

From the standpoint of employees covered by KPERS, the success or failure of KPERS's investment plan is not critical, as they

receive their defined benefits regardless. However, as to every tax-paying citizen of the state of Kansas or the various other public entities whose employees are part of KPERS, the increase in funds from KPERS's investments in turn reduces the taxes required to fund KPERS's liability to its beneficiaries. As such, KPERS's investment function is " 'primarily for the advantage of the *state as a whole.*' " *Grover v. City of Manhattan,* 198 Kan. 307, 309, 424 P.2d 256 (1967).

With this background, we return to the issue of the distinction between proprietary and governmental functions. The cases are innumerable, but may be divided for our purposes into (1) those where the State or some governmental entity has sought immunity from suit, (2) those where the State or some governmental unit has sought to avoid a statute of limitations barring a petition for recovery, and (3) several cases where the distinction between governmental and proprietary functions was collaterally involved and which were deemed to be persuasive authority by the parties.

The cases dealing with immunity from liability are legion. The doctrine of governmental or sovereign immunity, as it is sometimes interchangeably and possibly improperly called, has its origin in the ancient concept of *rex non potest peccare* (the king can do no wrong). Black's Law Dictionary 1323 (6th ed. 1990).

We described the history of this concept in Kansas in *Wendler v. City of Great Bend,* 181 Kan. 753, 758, 316 P.2d 265 (1957), a case concerning whether the operation of an airport by a municipality was a governmental or proprietary function. Our opinion harkened back to a 1788 English case involving a claim for damages to a wagon from a defective bridge and the English court's determination that an infinity of actions would be produced if recovery was allowed. In commenting on this ancient decision, we stated:

"Thus, on such slender grounds have rested thousands of decisions. Shadowy distinctions between 'governmental' functions and 'proprietary' affairs, between acts of the servants and acts of public corporate entities, between revenue-producing enterprises and those of a strictly gratuitous nature, have been used to decide cases, all without much rhyme or reason." 181 Kan. at 758.

No attempt will be made to summarize most of these cases, although several are instructive to give a flavor of the long Kansas

history resulting in the 1979 enactment of the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq*. The KTCA makes governmental entities, including the State and its political subdivisions, liable for damages in the same circumstances as a private person would be liable under the laws of this state. K.S.A. 75-6103. Litigation, however, still flourishes as we now struggle with the issues of the exceptions from liability established by K.S.A. 1996 Supp. 75-6104. See, *e.g., Gragg v. Wichita State Univ.*, 261 Kan. 1037, 934 P.2d 121 (1997).

An example of the governmental-proprietary litigation is the 1948 case of *Krantz v. City of Hutchinson, et al.*, 165 Kan. 449, 196 P.2d 227 (1948). The Krantzes sought to recover from the city for property damaged by overflowing floodwaters alleged to have resulted from the construction of a dike authorized by city officials. After recognizing the dual capacity of municipal corporations as both governmental and proprietary, we acknowledged: "The trend of judicial decisions generally is to restrict rather than to expand the doctrine of municipal immunity" (Syl. ¶ 7), but then stated:

"Among typical *governmental* functions of a municipality may be mentioned: Assessment and collection of its proportion of the state tax, police regulations, suppression of crime, protection of the public health, the exercise of eminent domain, operating a fire department, administration of justice.

"In 43 C.J. 182, 183, it is said that:

'When properly applied the term "*governmental* functions" should be limited to *legal duties imposed by the state upon its creature*, which it may not omit with impunity but must perform at its peril.' (Italics supplied.)

and that these governmental functions are those that are *exercised for the public good, generally*, and 'for the exercise of which the municipality *receives no compensation or particular benefit*.' (Italics supplied.)" 165 Kan. at 454.

The opinion proceeded to discuss certain proprietary functions of a city, acknowledged the cases "are legion and replete with conflict and with inconsistencies," and recognized that the trend was to restrict rather than extend the doctrine of municipal immunity. The *Krantz* court found:

"[W]e are unable to say that the acts of the city officials here complained of were in furtherance of a *governmental* function. They were not acts performed as an agency of the state, expressive of its sovereignty. They were not performed in promotion of the public welfare generally. They were performed for the special

financial benefit of the city and its property, and of its property owners. That was the controlling consideration. The acts were essentially transactions by and for the city in its individual corporate capacity." 165 Kan. 456-57.

Then, the real basis for the decision surfaces, and the opinion asks:

"Why should a city, however proper its purposes and however justifiable its course, be permitted to damage the property of private individuals outside the city in order to prevent damage to its own property and other property within the city, without compensation to such individuals for the damage they have sustained?" 165 Kan. at 457.

With this observation, the die was cast, and the opinion declared: "[N]o technical fiction should stand in the way of fair play and common justice." 165 Kan. at 447. The petition was held to have stated a valid cause of action against the city.

In reaching the conclusion that the operation of an airport is proprietary in nature, we said in *Wendler*, 181 Kan. 753, that when considering proprietary functions, actual pecuniary profit or gain has been disregarded by the courts, which have treated with more significance whether the activity is commercial in nature. We then recited that the airport in question was essentially a part of the city's transportation system, but in its operation, the city was engaged in a purely corporate capacity. With this we determined that the operation of the airport was a proprietary function of the municipality.

Another chapter in our history of governmental immunity is *Carroll v. Kittle*, 203 Kan. 841, 846, 457 P.2d 21 (1969), where we held that in operating the hospital at the University of Kansas Medical Center, the Board of Regents acted in a proprietary capacity. We there recognized that we had at times referred to sovereign immunity, but determined at that point to use the term "governmental immunity." We concluded "that the rule of governmental immunity from liability for torts committed while engaged in proprietary functions is today without rational basis and hence there is no logical compulsion to extend it because there is a voluntary mingling of governmental and proprietary functions." 203 Kan. at 850. We pointed out the futility of looking to laws of other states, overruled *McCoy v. Board of Regents*, 196 Kan. 506, 413 P.2d 73

(1966), and decided that in operating a hospital receiving paying patients, the Board of Regents should be held to the same responsibilities and liabilities as privately-owned hospitals. 203 Kan. at 850-51. This was a 4 to 3 decision, with the dissenters believing that *McCoy* should not be overruled and suggesting: "The difficulties which this court will encounter in determining whether the activity of government giving rise to possible tort liability is governmental or propriety are myriad." 203 Kan. at 853.

Finally, we come to the last cases of note in this area. *Brown v. Wichita State University*, 217 Kan. 279, 540 P.2d 66 (1975), *aff'd in part and vacated in part* 219 Kan. 2, 547 P.2d 1015 (1976) and *Brown v. Wichita State University, P.E.C., Inc.*, 217 Kan. 661, 538 P.2d 713 (1975). These cases arose out of the tragic deaths resulting from the crash of a chartered airplane carrying members of the 1970 Wichita State University football team, members of the faculty, and university supporters. By these opinions, the historical development of governmental immunity was exhaustively discussed, and the doctrine of governmental immunity as codified in K.S.A. 46-909 and K.S.A. 46-902 was declared to be unconstitutional as denying equal protection of the law, violating the guarantee of due process of the law, and violating the guarantees declared in § 18 of the Kansas Constitution Bill of Rights.

The *Brown v. Wichita State University* decisions, as well as the history established by all other immunity cases, were the impetus for the 1979 enactment of the KTCA. This brief history brings us down to the present regarding the doctrine of governmental immunity in Kansas. Although the doctrine is collaterally involved in our case and of historical significance, it does not in the final analysis give us much comfort or assistance in reaching any decision on the related issue of how statutes of limitations have been applied when the State and its subdivisions seek to recover damages for actions to the detriment of its citizens.

The line of cases much more applicable to our issue involves whether statutes of limitation may bar actions by the State or other governmental entities. These cases rely on a principle differing in origin from the doctrine of governmental immunity and have their

emphasis in the maxim *nullum tempus occurrit regi* (time does not run against the king). Black's Law Dictionary 1068 (6th ed. 1990).

The law as it relates to the application of general statutes of limitations on actions brought by the State, an agency, or subdivision was set forth in *State v. School District*, 34 Kan. 237, 242, 8 Pac. 208 (1885), where this court said:

"Now it is universally held by courts that no statute of limitations will run against the state or the sovereign authority unless the statute itself expressly so provides, or unless the implications of the statute to that effect are so strong as to be utterly unavoidable. It requires no citation of authorities to sustain this proposition."

This strong pronouncement was restated in *Osawatomie v. Miami County*, 78 Kan. 270, 96 Pac. 670 (1908), a case in which both sides of the present controversy derive comfort from different portions of the opinion. The ruling in *Osawatomie*, however, was:

"The rule that statutes of limitation do not apply to actions by the state unless a legislative intention that they shall do so is shown by express language or appears by the clearest implication also applies to subordinate political bodies, including municipal corporations, with respect to any litigation to enforce governmental rights." 78 Kan. 270, Syl. ¶ 1.

KPERS asks us to rely on this off-quoted case because of its statement that " '[t]he statute does not run against the state unless expressly so provided, and all doubts as to whether it does so run are to be resolved in favor of the state.' " 78 Kan. at 272. The opinion added:

" 'Theoretically, the rule that statutes of limitation do not run against governmental bodies when asserting a public right or protecting property held for public use, and that such statutes do run against such bodies when asserting private rights or enforcing rights arising from out of ordinary business transactions is sound. . . . It would seem that when all the people of the United States or of the state (both of which seem to be recognized as representing the sovereignty) are interested in the subject-matter of the litigation, that there is no question about the maxim applying, but that when only a portion of the people of the state—for instance, that part of the people residing in some minor subdivision of the state, such as a county or municipal corporation—are the sole parties interested in the subject-matter of the litigation, then the maxim does not apply. . . .'

"The geographical or territorial test proposed may be helpful in some instances, and even determinative in certain classes of cases, but we doubt its universal applicability. Inasmuch as the city exists in part as an agency of the state for general governmental purposes, and its maintenance depends upon its power to levy and

collect taxes, it might be argued that the state itself, or the general public, has an interest in protecting the exercise of that power. But the same argument might apply, although with less force, to the prosecution of any money demand, upon the ground that the purpose of enforcing it is to aid in meeting the expenses of maintaining the municipality. We think the more vital consideration has relation to the character of the power in exercise of which the demand originates. The power of taxation is an essential attribute of sovereignty. This is true no less of taxes levied by minor political divisions than of those directly imposed by the state. [Citation omitted.] No statute of limitation should apply to any step in the exercise of that power unless a legislative intention that it should do so is expressly stated or appears by the clearest implication." 78 Kan. at 274-76.

In this case, the City of Osawatomie sued Miami County, alleging that for a period of 15 years, the county had retained for its own benefit a part of the money collected from taxes levied by the City. The statute of limitations was held not to have run on these claims, and the opinion further noted:

"Although the county may have misappropriated the city's money, and thereby obliged the latter to sue for its recovery, the action is essentially to compel the performance of a public duty, and not to enforce a private contract.

. . . .

"The present controversy involves no element of private contract. It does not concern the vindication of any private right. It is between public officers or public bodies with respect to the performance of a public duty, in which the people of the state at large have at least an indirect interest. It is not affected by mere general provisions of the statute, and no statutory limitation is made to apply to it either in express terms or by necessary implication." 78 Kan. at 277.

In the intervening years, no decision of great import has moved away from these principles. A more modern case is represented by *Western Shale Products Co. v. City of Fort Scott*, 175 Kan. 643, 266 P.2d 327 (1954), which held that neither laches nor the statute of limitations applied to bar a claim based on the construction and maintenance of a city sewer, ordinarily deemed a governmental function. After pointing out that in some jurisdictions the determining question is whether the particular action seeks to enforce a public as distinguished from a private right, the court went on to remark:

"In this state it was early decided the source of the action must be considered, that is, whether the particular action is properly related to an exercise of some governmental rather than a mere proprietary function. Where it is the former,

the statute of limitations is not a bar. [Citations omitted.] Where it is the latter, a proprietary function, the statute is a bar. [Citations omitted.] This distinction was clearly indicated in a careful consideration of conflicting views on the subject in the early case of *Osawatomie v. Miami County*, supra, where it was held:

'The rule that statutes of limitation do not apply to actions by the state unless a legislative intention that they shall do so is shown by express language or appears by the clearest implication also applies to subordinate political bodies, including municipal corporations, with respect to any litigation to enforce governmental rights.' " 175 Kan. at 649.

We recognized in *Western Shale* that *Osawatomie* pinpointed the distinction between governmental and proprietary functions as follows: " 'We think the more vital consideration has relation to the character of the power in exercise of which the demand originates.' " 175 Kan. at 649.

With this background, we arrive at the 1963 adoption by the Kansas Legislature of K.S.A. 60-521, a new provision applicable to suits by governmental bodies as a part of our new Code of Civil Procedure:

"As to any cause of action accruing to the state, any political subdivision, or any other public body, which cause of action arises out of any proprietary function or activity, the limitations prescribed in this article shall apply to actions brought in the name or for the benefit of such public body in the same manner as to actions by private parties, except in (1) actions for the recovery of real property or any interest therein, or (2) actions to recover from any former officer or employee for his or her own wrongdoing or default in the performance of his or her duties."

The advisory committee notes applicable to this new statute reported that this section abolished the common-law maxim *nullum tempus occurrit regi* where public bodies operate in a proprietary capacity. They also indicated the common-law principle was no longer applicable in view of the complicated activities of such bodies.

In Vernon's Kansas C. Civ. Proc. § 60-521 (1967), the following comments are found:

"The authors are pleased to set out the following comments, written by Professor V. C. Martin of the Washburn University School of Law.

"This section is new. It recognizes the distinction between proprietary and governmental functions and codifies the prior case law that causes of action arising out of the proprietary function are subject to statutes of limitation. See, *Western Shale Products Co. v. City of Fort Scott*, 1954, 175 Kan. 643, 266 P.2d 327, for a

discussion of the law and citation of cases. The rule that causes of action arising out of the governmental function are not subject to statutes of limitation is recognized by omission from this section.

"Real property actions are excepted from statutes of limitation whether arising out of the governmental or proprietary function. See also, K.S.A. 60-509.

"The exception, from statutes of limitation, of actions to recover from officers and employees appears to be a clear statement of the Legislature's intention."

The first case where this new statutory provision was applied was *Board of County Commissioners v. Lewis*, 203 Kan. 188, 453 P.2d 46 (1969). This was an action to recover overcharges and penalties for materials and supplies purchased by the Sedgwick County Board of County Commissioners. The purchased materials were used by the county to maintain its roads and bridges and also included fire control equipment.

In response to a defense that the claim was time barred, *Lewis* held that application of general statutes of limitations is subject to the specific provisions of K.S.A. 60-521, which "does not apply, nor was it intended to apply, to actions brought by the state or by a county since the governmental-proprietary distinction as applied to cities in certain instances has never been applied in this jurisdiction to the functions and activities of an organized county." 203 Kan. 188, Syl. ¶ 4.

The unanimous *Lewis* court decided the early rule of *State v. School District*, 34 Kan. at 242, was still good law. That case enunciated the rule still applicable in this jurisdiction: " 'A statute of limitations will not run against the state or the sovereign authority unless the statute itself expressly so provides.' " 203 Kan. at 190 (quoting *State v. School District*, 34 Kan. 237, Syl. ¶ 3). The court then stated that *Osawatomie*, 78 Kan. 270, had reaffirmed the rule of *State v. School District* and made it applicable not only to the State, but also to political subdivisions such as counties with respect to any litigation to enforce governmental rights. 203 Kan. at 191.

The *Lewis* opinion then cited *Caywood v. Board of County Commissioners*, 194 Kan. 419, 421, 399 P.2d 561 (1965), and *McCoy*, 196 Kan. 506, to justify holding that

"[c]ounties, being agencies of the state, partake of attributes of the state itself insofar as the application of the doctrine of sovereign immunity, the statute of

limitations, and particularly the lack of ability to engage in proprietary functions and activities. [Citation omitted].

"Applying the foregoing legal principles, it follows that 60-521 does not apply, nor was it intended to apply, to actions brought by the state or its subordinate political subdivisions such as counties, to enforce governmental rights. In the instant case, the county was not engaged in a proprietary function or activity—in fact and in law it could not engage in such a function or activity since there does not exist such a thing as a proprietary function at the state or county level." 203 Kan. at 194.

This specific holding, if it were still the law of Kansas, would be fatal to the defendants' position. But, it is not the present rule in Kansas, as later in the same term the Kansas Supreme Court held in *Carroll,* 203 Kan. at 850-51, a 4 to 3 decision, that *McCoy* and all other cases holding that the State and its agencies could not be liable for tortious acts committed while engaged in a proprietary function were overruled.

This subsequent change had absolutely no effect on the result in *Lewis.* The opinion therein held that if the governmental-proprietary distinction was determinative, the building of bridges, maintenance of public roads, and prevention of fires were all governmental functions so that under K.S.A. 60-521, the statutes of limitations did not apply.

*Lewis* was followed by numerous cases which elaborated on and confirmed this clear statement of our law. In *State Highway Commission v. Steele,* 215 Kan. 837, 528 P.2d 1242 (1974), we held that an action by the State Highway Commission to recover damages to a bridge caused by an automobile was not barred by the 2-year statute of limitations. This opinion quoted from the same portion of Vernon's previously referred to herein and went on to hold: "In a long line of cases, the most recent of which are *Board of County Commissioners v. Lewis,* 203 Kan. 188, 453 P.2d 46; and *Riggan v. Director of Revenue,* 203 Kan. 129, 453 P.2d 52, this court has consistently held that the statutes of limitation do not run against the state unless specifically provided by statute." 215 Kan. at 839.

The appellate courts again stated in *State ex rel. Schneider v. McAfee,* 2 Kan. App. 2d 274, Syl. ¶ 2, 578 P.2d 281, *rev. denied* 225 Kan. 845 (1978), that "[s]tatutes of limitations do not run

against the state unless specifically provided by statute." The Court of Appeals ruled:

"(1) The procuring of architect's services was incidental to and a part of the state's overall duty to provide education for the citizens of the state, and (2) the hiring of an associate architect pursuant to K.S.A. 75-5401, *et seq.*, is a governmental function of the state. Accordingly, the trial court erred in holding that the cause of action was barred by the two-year statute of limitations for tort set forth in K.S.A. 60-513(4)." 2 Kan. App. 2d 274, Syl. ¶ 3.

The *McAfee* opinion relied on the *Steele, Lewis,* and *Riggan* cases that distinguished governmental-proprietary functions in this manner:

"Governmental functions are those which are performed for the general public with respect to the common welfare for which no compensation or particular benefit is received, while proprietary functions are exercised when an enterprise is commercial in character or is usually carried on by private individuals or is for the profit, benefit or advantage of the governmental unit conducting the activity." 2 Kan. App. 2d at 276.

A case with a similar holding involved the leaking roof of a school district building. It was determined in *U.S.D. No. 490 v. Celotex Corp.,* 6 Kan. App. 2d 346, 629 P.2d 196, *rev. denied* 230 Kan. 819 (1981), that statutes of limitations do not run against the State when the action arises out of the performance of a governmental function such as a school board's construction of a school building. Here, it was noted that the construction of a school building is incidental to and a part of the State's overall duty to provide public education for the citizens of the state. The operation of a high school building by a school board was found to be a governmental function.

The next interesting case regarding this issue was *State ex rel. Stephan v. Brotherhood Bank and Trust Co.,* 8 Kan. App. 2d 57, 649 P.2d 419, *rev. denied* 232 Kan. 876 (1982). This case held that an action arising out of the attorney general's duty to enforce the Kansas Consumer Protection Act is in furtherance of a governmental function, notwithstanding the fact that the underlying action involved a transaction between two individuals. In describing the distinction between governmental and proprietary functions, the court reiterated that governmental functions are performed for the common welfare and proprietary functions are commercial, as

declared in *McAfee*, 2 Kan. App. 2d 274, Syl. ¶ 3, and previously set forth.

Next in the chronology of our Court of Appeals' decisions is *City of Attica v. Mull Drilling Co.*, 9 Kan. App. 2d 325, 676 P.2d 769 (1984), which does not fit into, but is not inconsistent with, the earlier pattern. The City of Attica sued numerous oil and gas operators for salt water contamination of the city's water wells. Here, K.S.A. 60-521 was found not to exempt the city from application of the statute of limitations because the cause of action arose out of the exercise of a purely proprietary function.

*City of Attica* cited *Cross v. City of Kansas City*, 230 Kan. 545, 549, 638 P.2d 933 (1982), which found that a municipality in the operation of public waterworks, which also serves as a water supply for fire fighting, does so in a dual capacity so that the furnishing of water for fire fighting is governmental and the remaining portion of the waterworks function is proprietary. *Cross* was an immunity rather than a limitations case, but it appears to show that an agency of government can be acting in either a governmental or a proprietary function depending on who is expected to benefit from its actions.

This dual power of a municipal corporation was again referred to in *International Ass'n of Firefighters v. City of Lawrence*, 14 Kan. App. 2d 788, Syl. ¶ 3, 798 P.2d 960, *rev. denied*, 248 Kan. 996 (1991), which stated:

"Governmental or legislative powers are exercised to administer the affairs of the state and promote the public welfare generally. Proprietary or administrative powers are exercised to accomplish private corporate purposes in which the public is only indirectly concerned and as to which the municipality is regarded as a legal individual."

Additional holdings of a similar nature include *State v. Graham*, 12 Kan. App. 2d 803, 758 P.2d 247 (1988) (holding K.S.A. 60-514[c] is not applicable to a habitual violator action under K.S.A. 8-284 *et seq.* because the State's cause of action arises out of the governmental function of regulating highway safety); *State ex rel. Stephan v. GAF Corp.*, 242 Kan. 152, 747 P.2d 1326 (1987) (finding fraud claims for roof damage to state building not subject to period of limitations). The *GAF* decision also made the important

point that "[t]he reasons supporting tort immunity are not the same as those which support an extension of time limitations to the State beyond those limits governing individuals." 242 Kan. at 163.

The issue before us was central to a recent decision by the United States District Court for the District of Kansas and the Tenth Circuit Court of Appeals in *City of Wichita, Kan. v. U.S. Gypsum Co.*, 828 F. Supp. 851 (D. Kan. 1993), *aff'd in part and rev'd in part on other grounds City of Wichita, Kan. v. U.S. Gypsum Co.*, 72 F.3d 1491 (10th Cir. 1996). This case involved suits against manufacturers of asbestos used in the construction of a public library and the Century II Civic Cultural Center in Wichita. The statute of limitations was at issue, giving rise to the question of whether the claim for relief accrued or arose out of a proprietary or a governmental function.

The well-reasoned district court opinion cited many of the cases we have previously referred to and ultimately focused on the factual and legal elements from which the city derived the right to maintain the action, rather than the concerns that prompted the exercise of those rights. It concluded that the operation of the public library was a governmental function, while the predominant function of the Century II building was to provide commercial benefits to the city and, thus, its operation was characterized as proprietary. 828 F. Supp. at 862-63.

K.S.A. 60-521 was central to the district court opinion that cited both sovereign immunity and statutes of limitations cases that recognized "the reasons for restricting immunity of the sovereign from suit do not support a restriction of the sovereign's immunity from the statute of limitations." 828 F. Supp. at 861. Further, the district court stated:

"The court can agree with plaintiff that Kansas has taken a more favorable view of governmental immunity from the statute of limitations than governmental immunity from suit. Indeed, the importance that Kansas attaches to the preservation of *public* rights from the bar of the statute may be inferred from the enactment of K.S.A. § 60-521, which, by negative implication, retains governmental immunity from the statute of limitations for causes of action arising out of governmental functions. *State Highway Comm'n v. Steele*, 215 Kan. 837, 839, 528 P.2d 1242, 1244 (1974). As plaintiff states, 'the doctrine of governmental immunity from statutes of limitation has been and remains supported in modern law by the im-

portant policy that *public* rights and causes of action should not be lost by the acts or omissions of public officers.' [Citations omitted.]

"*Public* rights, however, are not at issue when a municipality's cause of action arises out of a proprietary function. The court finds no authority for the proposition that the court should resolve 'all doubts' in favor of the governmental entity, merely by virtue of that status, on the question of whether its cause of action arises out of a governmental as opposed to proprietary function. Plaintiff attempts to support this proposition with language from *City of Osawatomie v. Board of County Comm'rs*, 78 Kan. 270, 96 P. 670 (1980), where the court stated:

'The statute does not run against the state unless expressly so provided, and all doubts as to whether it does so run are to be resolved in favor of the state. This rule extends to minor municipalities created as local governmental agencies *in respect to governmental affairs affecting the general public.*' [Citation omitted.]

"Contrary to plaintiff's belief, neither this nor any other case cited by plaintiff requires the court to grant municipalities a favorable resolution of 'all doubts' regarding whether their cause of action arises out of a proprietary or governmental function. The rule of *statutory construction* cited by plaintiff is a rule that does not favor application of time restrictions to the sovereign for its actions arising out of *governmental* functions when it is doubtful whether the legislature intended for time restrictions to bar such actions. *See State v. Dixon*, 90 Kan. 594, 596, 135 P. 568, 569 (1913) ('statutory limitations do not run against the state *when it sues in its sovereign capacity,* unless the statute expressly includes the state or the intention to include the state is shown by the clearest implication'); *State v. Graham*, 12 Kan. App. 2d 803, 807, 758 P.2d 247, 251 (1988); *Badaracco v. Commissioner*, 464 U.S. 386, 391, 104 S. Ct. 756, 760, 78 L. Ed. 2d 549 (1984). The question presented in this case, however, is *whether* the City's cause of action arises out of a governmental function. If it does, then K.S.A. § 60-521 leaves no room for doubt that the City's action is not subject to the statute of limitations. If it does not, then the two-year statute of limitations under K.S.A. 60-513 comes into play.

"The court concludes that no rule of law favors either defendants or plaintiff in determining whether plaintiff's cause of action arises out of a proprietary or governmental function." 828 F. Supp. at 861-62.

The district court then analyzed the functions of the City of Wichita's two buildings and reached the conclusions we previously recited. The Tenth Circuit essentially agreed with the trial court's decision and the underlying authority it cited and utilized.

The final authority which covers the identical issue we now consider arose from the *KPERS v. Reimer & Koger (Home Savings)* litigation that has been previously discussed. The federal district court's opinion filed May 3, 1994, contained no analysis, but simply

held that KPERS's cause of action arose out of a proprietary function or activity as opposed to a governmental function.

On appeal to the Eighth Circuit this important issue was not even mentioned in an opinion centered on the retroactivity of K.S.A. 60-522. As such, neither of these opinions is of assistance to us. However, the governmental-proprietary distinction was considered by the Eighth Circuit in its opinion filed May 13, 1997, and submitted to us as additional authority on May 22, 1997, after oral argument in our case.

The most recent Eighth Circuit opinion dealt primarily with the defendants' assertions that KPERS's claims were time barred by K.S.A. 60-512 and K.S.A. 60-513(a) and suggested that KPERS's contention that its claims are not subject to any statute of limitations may not be relitigated under the law of the case doctrine. (Slip opinion at 16). Nevertheless, the opinion stated the law of the case doctrine does not apply when it results in manifest injustice and proceeded with the following discussion and holding:

"KPERS argues that its investment in Home Savings was a governmental function, and therefore, its claims arising out of that investment are not subject to any statute of limitations.

"The Kansas Supreme Court has stated that '[m]aintaining KPERS is a proprietary function of the state.' *In re Midland Indus.*, [237 Kan. 867, 870,] 703 P.2d 840, 843 (1985) (discussing the holding of *Shapiro v. KPERS*, [216 Kan. 353,] 532 P.2d 1081 (1975)). In *Shapiro*, the Kansas Supreme Court rejected the argument that sovereign immunity barred payment of interest on a claim for benefits made by an employee's widow. *Shapiro*, [216 Kan. at 357,] 532 P.2d at 1085. *Shapiro* looked to the statutes creating KPERS as a body corporate with the power to sue and be sued, and held that if a government enters into business ordinarily reserved to the field of private enterprise, it should be held to the same responsibilities and liabilities. *Id.* at 1083-84. A member of KPERS or his beneficiary should be provided the same protection and the same redress as if the breach of contract had been committed by a private insurance company. *Id.* at 1084-85. While the issue in *Shapiro* involved a claim for benefits only, *Midland's* explanation of the holding in *Shapiro* demonstrates the broad scope of the ruling. These clear holdings compel rejection of KPERS's argument.

"Indeed, the Kansas legislature in enacting section 60-522, Kan. Stat. Ann. § 60-522 (1994), which we discussed at length in *KPERS III*, has acknowledged that statutes of limitation run as to claims asserted by KPERS.

"KPERS has made extended arguments that its operations are governmental functions as opposed to proprietary. The Kansas Supreme Court has made clear

that an activity is a proprietary function if it is commercial in character, usually carried on by private parties, or conducted for profit. *See Carroll v. Kittle,* [203 Kan. 841, 848,] 457 P.2d 21, 28 (1969); *State ex rel. Schneider v. McAfee,* [2 Kan. App. 2d 274, 276,] 578 P.2d 281, 283 (1978). KPERS's actions arising from its investment activities meet this description fully, and do not differ from the suit for contractual benefits involved in *Shapiro.*

"Similarly, KPERS argues that the investments are governmental because the profits reduce the burden on Kansas taxpayers to fund KPERS, the funds were invested to stimulate the Kansas economy, and Kansas statutes require the funds to be invested. Insofar as these arguments are not answered by those cases we have cited above, the Kansas Supreme Court's decisions in *Wendler v. City of Great Bend,* [181 Kan. 753, ] 316 P.2d 265, 269, 274 (1957), and *Grover v. City of Manhattan,* [198 Kan. 307,] 424 P.2d 256, 259 (1967), compel rejection of KPERS's arguments. This analysis also forecloses KPERS's argument that its claims against Peat Marwick arise out of governmental functions." (Slip opinion at 17-19.)

Our foregoing discussion has developed the two ways the governmental-proprietary distinction has evolved in immunity and statute of limitations cases. Before we apply these cases to KPERS's activities in this appeal and reach the conclusion these cases compel, we will briefly discuss several cases which are claimed by the parties to be applicable authority.

In *Greeley County Comm'rs v. Horace State Bank,* 135 Kan. 126, 9 P.2d 986 (1932), we determined that a nonclaim statute ran against a county that made a late claim against a failed bank in which it was a depositor. We said: "[N]o attribute of sovereignty or governmental function is involved in the matter of a county keeping a bank account. . . . The doing of ordinary business is not governmental." 135 Kan. at 127.

The defendants seize on this wording to argue that investing money is just like maintaining a bank account. As both are commercial in nature, the defendants contend it follows that the investing of state funds is also commercial and, thus, a proprietary action. KPERS groups *Greeley County Comm'rs* among those cases where the question of the governmental-proprietary distinction arose in the context of governmental immunity, and it claims such cases have little value in determining the distinction for the purpose of deciding whether the government is barred by a period of limitation. We believe that KPERS improperly groups *Greeley*

*County Comm'rs* with the governmental immunity cases. However, KPERS is correct in the sense that this case also is not one where a statute of limitations was applied to a governmental claim.

The *Greeley County Comm'rs* opinion clearly stated that the result it reached was necessary to allow the affairs of a failed bank to be wound up in a "businesslike and beneficial manner." 135 Kan. at 127. The opinion went on to hold:

"But, the statute is not a statute of limitation. It is a nonclaim statute, similar in purpose and effect to the statutes requiring presentation within limited periods of claims against decedents' estates. According to what this court regards as the better view and the weight of authority, such statutes apply to a common claim of the state, and of a county." 135 Kan. at 127-28.

An excellent discussion of the differences between a nonclaim statute and a statute of limitations is found in *Sovereign Immunity from Statutes of Limitation*, 46 Maryland L. Rev. 408, 426-27 (1987). The article explains that nonclaim statutes are preconditions of suit, with their time limits applying to government irrespective of sovereign immunity. This is the logical explanation of the result in *Greeley County Comm'rs*. We look at it only as holding that nonclaim statutes apply to governmental units. As such, it has little significance in reaching our decision herein.

We place a similar lack of significance in a statement of pure dicta in *In re Tax Protests of Midland Industries, Inc.*, 237 Kan. 867, 870, 703 P.2d 840 (1985), that maintaining KPERS is a proprietary function. We previously held in *Shapiro v. Kansas Public Employees Retirement System*, 216 Kan. 353, 532 P.2d 1081 (1975) (*Shapiro II*), that state retirement systems create contracts between the State and its employees, so that employees could sue for KPERS's breach of contract and obtain interest as a proper element of damages. An earlier case, *Shapiro v. Kansas Public Employees Retirement System*, 211 Kan. 452, 507 P.2d 281 (1973) (*Shapiro I*), had allowed recovery of accidental death benefits, and *Shapiro II* merely held the earlier award also included the right to recover interest.

Ten years later, in *Midland*, we held that under the doctrine of sovereign immunity, a county is not liable for interest on its obligations unless some statute expressly so provides. The taxpayers

attempted to argue that this rule had been abrogated by the decision in *Shapiro II,* and we answered this contention with the following comments:

"In *Shapiro,* the issue was whether a widow of a member of the Kansas Public Employees Retirement System (KPERS) was entitled to recover interest on accidental death benefits wrongfully withheld by the system. KPERS is a state retirement system which creates contracts between the state and its employees who are members of the system. Maintaining KPERS is a proprietary function of the state, and the state has expressly provided that KPERS may be sued on its contractual obligations.

"We determined that where a state legislature has consented that one of its agencies may be sued on its express contracts, the waiver of sovereign immunity should extend to every aspect of its contractual liability including the right of the contracting party to recover interest where it is customarily included as a part of the damages to be awarded for breaches of contracts. This court has held on numerous occasions that where the state is involved in a proprietary or private function, it will be held to the same responsibility as a private person for injuries resulting from failure to meet its contractual obligations or as a result of its negligence. *Carroll v. Kittle,* 203 Kan. 841, 457 P.2d 21 (1969).

"Absent a statute expressly imposing liability, a municipality is not liable for its performance of a governmental function. Ordinarily a municipality is engaged in the performance of a governmental function when it exercises the sovereign power delegated to it to look after the general public good and after the peace, health and well being of the citizens of the state at large. *Grover v. City of Manhattan,* 198 Kan. 307, 424 P.2d 256 (1967); *Wendler v. City of Great Bend,* 181 Kan. 753, 316 P.2d 265 (1957). The collection of taxes by a municipality is a governmental function and not a proprietary one.

"Therefore, the rule of *Shapiro* is not applicable to the present case, and the general rule that a county is not liable for interest on its obligations unless some statute expressly so provides does apply." 237 Kan. at 870-71.

When our statement that "[m]aintaining KPERS is a proprietary function" is read in context with the entire *Midland* opinion, it is clear we were looking at a different question (the allowance of interest), and the statement was based on the *Shapiro I* holding of protecting state employees from any breach of their contractual rights by KPERS. We did not, as the defendants claim, decide that maintaining KPERS is always a proprietary function, but only held that employees have contractual rights which, in the vernacular of the time, were translated as proprietary rather than governmental.

We deem the statement to be unprecedential in nature and not binding in any manner on the considerations we make herein.

Defendants point to the most recent *Home Savings* case, filed May 13, 1997, as authority for the proposition that KPERS's investment activities are proprietary. In this decision, the Eighth Circuit looked to *Midland* and *Shapiro II* in its analysis, finding that KPERS's activities are proprietary. The *Home Savings* opinion failed to recognize the distinction between governmental immunity cases and those involving statutes of limitations. It also failed to recognize that there is a significant distinction between a suit by employees to recover contractual benefits and a suit by KPERS arising from its investment activities. Due to these failures, and the heavy reliance upon *Midland*, we place little persuasive value on the Eighth Circuit opinion.

While the defendants champion *Greeley County Comm'rs* and *Midland*, KPERS points to the recent holding in *K.D.F. v. Rex*, 878 S.W.2d 589 (Tex. 1994), where the Supreme Court of Texas held that because KPERS's functions are governmental, Texas must recognize its sovereign immunity in a tort action by a debtor against a secured creditor alleging wrongful refusal to release a security interest. Regarding the debtor's allegation that KPERS was engaged in a commercial rather than a governmental activity, the Texas Supreme Court stated:

"We disagree. Initially, it is not clear to us that investing the retirement savings of state employees can be categorized as purely, or even primarily, a commercial activity. Kansas is not, for example, operating a mutual fund in which the general public may invest. Rather, KPERS exists to permit the Kansas government to fulfill its governmental function as a public employer." 878 S.W.2d at 595.

*K.D.F.* is again a sovereign immunity case and not one where the question of the application of a statute of limitations was in issue. However, its reading does support the arguments of KPERS that its overall investment function is purely governmental for the benefit of the public at large.

As we begin to analyze the various tests of the cases we have reviewed, it is readily apparent that the nature and extent of our view of the overall issue will in a large degree determine the result we reach. See *In re Estate of Koch*, 18 Kan. App. 2d 188, 215, 849

P.2d 977, *rev. denied* 253 Kan. 858 (1993). If we viewed each investment action and decision separately as only a commercial transaction, as did the Eighth Circuit in the recent *Home Savings* case, we could find the acts to be proprietary in nature. However, if we take a broader perspective of the entire problem, it is more realistic to determine that the investment of KPERS funds is necessary to promote the public welfare generally and to satisfy the contractual and taxation obligations of the State of Kansas, the school districts, the municipalities, and the other governmental entities to their employees. This view indicates KPERS's investment activities are governmental in nature.

In making this analysis, we are not guided by the governmental immunity cases but rather by those that are directly related to our question—the application of statutes of limitations to actions brought by the State or its agencies, counties, municipalities, school districts, or other governmental units.

K.S.A. 60-521 sets forth the Kansas Legislature's intention to have periods of limitations apply to proprietary functions or activities. But, the rule of *State v. School District*, 34 Kan. 237, Syl. ¶ 3, 8 Pac. 208 (1885), that "[n]o statute of limitations will run against the state or the sovereign authority unless the statute itself expressly so provides," requires that we find causes of action arising out of a governmental function are not subject to any statute of limitations.

In applying *Osawatomie v. Miami County*, 78 Kan. 270, 96 Pac. 670 (1908), it is clear that here KPERS is "asserting a public right or protecting property held for public use." 78 Kan. at 274. All taxpayers of Kansas and those of any city, county, school district, or other governmental entity within the KPERS system are interested in the subject matter of this litigation because it may have a very direct effect on the amount of taxes levied in the future. *Osawatomie* recognizes: "The power of taxation is an essential attribute of sovereignty." 78 Kan. at 275. Therefore, "[n]o statute of limitation should apply to any step in the exercise of that power unless a legislative intention that it should do so is expressly stated or appears by the clearest implication." 78 Kan. at 275-76. The defendants' claim that KPERS is only attempting to "enforce rights

arising out of ordinary business transaction[s]" has merit, but fails to view the KPERS litigation in its overall significance. Applying the language of *Osawatomie* as the defendants desire would make KPERS's litigation trivial when in reality KPERS is seeking to recover millions of dollars which the public will otherwise be forced to pay in higher taxes.

In *Western Shale Products Co. v. City of Fort Scott*, 175 Kan. 643, 649, 266 P.2d 327 (1954), we find " 'the more vital consideration has relation to the character of the power in exercise of which the demand originates.' " (quoting *Osawatomie*, 78 Kan. at 275.) In the KPERS cases, this is clearly the investment of tax dollars necessary to satisfy contractual obligations of governmental bodies. Again, this is a governmental function.

*Board of County Commissioners v. Lewis*, 203 Kan. 188, 453 P.2d 46 (1969), must be read in the limited context we earlier discussed, but it remains valid precedent for a rule that building bridges, maintaining roads, and preventing fires are all governmental functions to which, under K.S.A. 60-521, the statutes of limitations do not apply. Each of these acts is for the overall benefit of the citizens of our state, as is KPERS's duty to satisfy contractual obligations for pension benefits to employees.

In *State Highway Commission v. Steele*, 215 Kan. 837, 528 P.2d 1242 (1974), the limitations period did not run against an action to recover damages to a bridge. The expense of such a repair should come from the tortfeasor rather than the taxpayers. A similar result is asked for by KPERS herein, as it argues that the KPERS fund should be restored by the potential tortfeasors rather than Kansas taxpayers.

Investment advice and services can be equated to an architect's services which were dealt with in the holding of *State ex rel. Schneider v. McAfee,* 2 Kan. App. 2d 274, 578 P.2d 281, *rev. denied* 225 Kan. 845 (1978). Both jobs relate to governmental functions of the State. The same result is justified as to the builder of a leaking roof of a school district building, in which the construction of a school building also was found to be a governmental function. *U.S.D. No. 490 v. Celotex Corp.*, 6 Kan. App. 2d 346, 629 P.2d 196, *rev. denied* 230 Kan. 819 (1981).

*State ex rel. Stephan v. Brotherhood Bank and Trust Co.*, 8 Kan. App. 2d 57, 649 P.2d 419, *rev. denied* 232 Kan. 876 (1982), related to the enforcement by the attorney general of the Kansas Consumer Protection Act, with the governmental-proprietary distinction clearly defined as in the earlier cases. Nevertheless, although the underlying transaction was between two individuals, it was deemed to be a governmental function to enforce the State's rights in that case. That is actually what KPERS is doing here, enforcing the rights of all contributors of tax dollars to the funds necessary to satisfy KPERS's contractual obligations.

*City of Attica v. Mull Drilling Co.*, 9 Kan. App. 2d 325, 676 P.2d 769 (1984), does not fit into the preceding chronology but is best explained by its reliance on *Cross v. City of Kansas City*, 230 Kan. 545, 638 P.2d 933 (1982), where the operation of public waterworks had dual purposes, both proprietary and governmental. Under *City of Attica*'s facts, the city's action was deemed proprietary.

*International Ass'n of Firefighters v. City of Lawrence*, 14 Kan. App. 2d 788, 798 P.2d 960, *rev. denied* 248 Kan. 996 (1991), speaks of proprietary powers as those in which the public is only indirectly concerned. The public is much more than indirectly interested in the investment affairs of KPERS when it has the tax obligation to uphold KPERS's financial integrity. KPERS's investments are in fact "affairs of the state and promote the public welfare generally," thus making them governmental in nature. 14 Kan. App. 2d at 794.

We have exhaustively quoted from *City of Wichita, Kan. v. U.S. Gypsum Co.*, 828 F. Supp. 851 (D. Kan. 1993), and believe that its holding is consistent with the result we reach herein. The Century II building was found to be primarily for the city's commercial benefit, making it proprietary in nature, while the public nature of the library made it governmental. Our holding is not inconsistent with this result.

Finally, as we previously indicated, we hold that the decisions in *KPERS v. Reimer & Koger* (*Home Savings*), regarding governmental-proprietary functions were incorrectly decided and never reached a proper analysis of the underlying Kansas law on the governmental-proprietary distinction involving the application of stat-

utes of limitations to governmental entities. As such, these opinions offer no persuasive authority to assist us in this case.

We hold the actions of KPERS involved in this litigation are all governmental in character, to which no statute of limitations applied until the Kansas Legislature enacted K.S.A. 60-522 in 1992. Thus, the trial court's ruling refusing to grant summary judgment to the defendants was proper.

*Collateral estoppel*

Three of the defendants to the cases herein, Reimer & Koger; Shook, Hardy & Bacon; and Blackwell Sanders Matheny Weary & Lombardi were parties to *KPERS v. Reimer & Koger (Home Savings)* and argue that KPERS should be collaterally estopped from relitigating the issues herein because of the rulings by the United States District Court for the Western District of Missouri and the Eighth Circuit Court of Appeals. All the other defendants assert we should abandon the mutuality requirement of collateral estoppel and hold that the federal decisions should apply to them as well. We decline both invitations.

Collateral estoppel serves three salutary purposes: (1) to avoid the expense and vexation attending multiple lawsuits, (2) to conserve judicial resources, and (3) to foster reliance on judicial action by minimizing the possibility of inconsistent decisions. *Montana v. United States*, 440 U.S. 147, 153-54, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979). None of these purposes exist here. In actuality, for the many different reasons we hereafter briefly recite, application of collateral estoppel under the unique facts of the KPERS litigation would have the effect of fostering injustice and allowing a federal court to preclude consideration of its erroneous determination of state law. Additionally, an authoritative decision by this court will prevent, not promote, inconsistent decisions. Any suggestion that this court is precluded from deciding a question of our state law is without merit.

Federal court decisions on issues of state law are not binding on and have limited precedential effect in state courts. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78-79, 82 L. Ed. 2d 1188, 58 S. Ct. 817 (1938). As we said in *State ex rel. Stephan v. Finney*, 254 Kan. 632,

633, 867 P.2d 1034 (1994): "The interpretation of the laws . . . of Kansas by the Supreme Court of Kansas is controlling upon the federal and all Kansas courts. *Quality Oil Co. v. du Pont & Co.*, 182 Kan. 488, 493, 322 P.2d 731 (1958)." In addition, the First Circuit noted in *Commerce Oil Refining Corporation v. Miner*, 303 F.2d 125, 128 (1962):

"Indeed, since *Erie v. Tompkins*, there can be even less claim to a 'right' to have a federal court resolve questions of local law. No one could seriously suggest that an 'informed prophecy' as to the meaning of a state statute is to be preferred to an 'authoritative decision', let alone that the former is to be protected from the latter."

Those defendants who were not parties to the *KPERS v. Reimer & Koger (Home Savings)* litigation would not, under any circumstances, be allowed the benefit of collateral estoppel unless we abandon the mutuality of the parties requirement. This, we decline to do. In *Bank of Kansas v. Davison*, 253 Kan. 780, 784, 861 P.2d 806 (1993), we said:

" 'Collateral estoppel prevents a second litigation of the same issues between parties or their privies.' *In re Estate of Beason*, 248 Kan. 803, 813, 811 P.2d 848 (1991). The requirements of collateral estoppel are:

'(1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment; (2) the parties must be the same or in privity; and (3) the issue litigated must have been determined and necessary to support the judgment.' *Estate of Beason*, 248 Kan. at 813."

In *McDermott v. Kansas Public Serv. Co.*, 238 Kan. 462, 712 P.2d 1199 (1986), we examined the issue of whether we should abandon the absolute mutuality requirement in order to apply collateral estoppel. We determined that mutuality remained the majority rule in the United States and that abandonment of the rule would not be fair. We again reached this result in *Jones v. Bordman*, 243 Kan. 444, 460, 759 P.2d 953 (1988), where we said we have "held that collateral estoppel, or issue preclusion, required mutuality; *i.e.*, the issue subject to preclusion must have arisen in a prior case in which both of the current parties were adequately represented."

This decision resolves the issue of the application of collateral estoppel to those KPERS defendants without mutuality. But, we have three defendants who did take part in the *Home Savings* case. Although two were intervenors, our law is clear that those who intervene in a lawsuit are bound by judgments rendered in that suit the same as any other party. *Brent v. McDonald,* 180 Kan. 142, 155, 300 P.2d 396 (1956). There are, however, exceptions to the application of collateral estoppel, and we believe the unique facts here show collateral estoppel should not be applied to those three defendants.

The present status and ultimate disposition of the *Home Savings* case remains in issue as shown by the opinion of the Eighth Circuit of May 13, 1997, recently called to our attention. As such, it may be significant that in *Delano v. Kitch,* 663 F.2d 990, 996 (10th Cir. 1981), a federal appeals court stated:

"[A]fter a federal court decided an issue of Kansas substantive law, the Kansas Supreme Court made a contrary decision on the same issue. Under such circumstances, we said, 'it is the duty of the Federal court that still has jurisdiction of the case to conform its decision and judgment to the latest decision of the supreme court of the state.'"

If such is the case here, our judgment on a matter of Kansas law should be allowed to have controlling effect.

One authority, 46 Am. Jur. 2d, Judgments § 540, states that certain cases have not applied the rule of collateral estoppel to bar relitigation of unmixed questions of law erroneously reached in a decision. This rule is derived from the Restatement (Second) of Judgments § 28 (1982), which reads:

"Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:

. . . .

"(2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws."

Several United States Supreme Court decisions have recognized the existence of this exception to the rule, even if under the facts

of the cases being decided it determined that the exception should not apply. In *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 78 L. Ed. 2d 388, 104 S. Ct. 575 (1984), the court said: "Our cases, however, recognize an exception to the applicability of the principles of collateral estoppel for 'unmixed questions of law' arising in 'successive actions involving unrelated subject matter.'" 464 U.S. at 171 (quoting *Montana v. United States*, 440 U.S. 147, 162, 59 L. Ed. 2d 210, 99 S. Ct. 970 [1979]). In choosing not to apply the exception in *Stauffer*, the Court declared the litigation was substantially related with virtually identical facts.

In *Montana*, 440 U.S. 147, the Court also decided the exception should not apply, but it did make some statements indicating that the decision might have been different under other circumstances, which may apply here. First, it noted that no major changes had occurred in the law governing the issue in between the two suits. Second, the Court pointed out that the plaintiff in the first case freely submitted federal claims to a state court and had them decided there.

In the present case, a major change has occurred, albeit concurrently, in state law since *Home Savings* was decided, as we are required to decide the merits of the issues alleged by KPERS as against all those defendants to whom we have decided collateral estoppel does not apply. Second, KPERS did not willingly litigate this undecided issue of state law in federal court.

KPERS cites several cases where courts have decided not to apply collateral estoppel despite the fact that the rule would traditionally apply. In *Wright v. Chicago Mun. Emp. Cr. Union*, 265 Ill. App. 3d 1110, 639 N.E.2d 203 (1994), an Illinois court stated it declined to apply collateral estoppel to unmixed questions of law, although there also was no mutuality under the facts of the case.

In *Am. Home Assur. Co. v. Intl. Ins. Co.*, 219 App. Div. 2d 143, 147, 641 N.Y.S.2d 241 (1996), the court said:

"This court has interpreted the doctrine of collateral estoppel to mean that when an issue of ultimate *fact* has once been determined by a valid and final judgment, that issue cannot again be litigated by the losing party in any future lawsuit, but that collateral estoppel does *not* apply to an unmixed or pure question of law. [Citations omitted.] That this case presents a purely legal issue constituted,

in and of itself, a sufficient basis upon which to preclude application of collateral estoppel. Furthermore, it has been observed that collateral estoppel is a flexible doctrine which can never be rigidly or mechanically applied."

Finally, in *Tankersley v. Durish,* 855 S.W.2d 241, 245 (Tex. App. 1993), a case where a third party alleged that neither party to the first action could relitigate a matter, the court noted: "Courts disfavor applying collateral estoppel in the context of a pure question of law." In deciding that collateral estoppel did not apply and that the state court should consider the merits of the case under Texas law, the court also pointed out that absent application of collateral estoppel, the state court would not have been bound by an Eighth Circuit opinion interpreting Texas law.

The defendants cite one case, *Fidler v. E.M. Parker Co.,* 394 Mass. 534, 476 N.E.2d 595 (1985), where the court insisted on applying collateral estoppel despite the question being one of pure law. Obviously, the issue is one where states are likely to come down on both sides. However, this case is also somewhat distinguishable. First, apparently Massachusetts courts look to federal law in deciding whether collateral estoppel applies. Second, that court did not have to reach the merits of the issue for other parties, as we do here; thus, there was no intervening change in state law such that the second requirement of the Restatement rule could be met. Third, the court went into a discussion of the merits anyway and apparently agreed with the federal court's interpretation of the state law. These are all distinguishing factors.

We are not bound by any previous Kansas holding on this issue, and Kansas law, not federal rules, applies to our decision of whether to collaterally estop KPERS from litigating these issues of purely state law. See, *e.g., Edens v. Laubach,* 838 F. Supp. 510, 514 (D. Kan. 1993) ("The Full Faith and Credit Statute, 28 U.S.C. § 1738, requires that this court apply Kansas law to determine the preclusive effect of prior state court decisions."). Under all of the facts and circumstances of this case and for all the reasons previously set forth, we decline to apply the doctrine of collateral estoppel in this case.

*Constitutionality and retroactivity of K.S.A. 60-522*

Under our holding herein, no period of limitations would have applied to civil actions brought for governmental functions of KPERS until the 1992 Kansas Legislature enacted K.S.A. 60-522. The law became effective July 1, 1992, and reads as follows:

"(a) Notwithstanding any other limitations contained in article 5 of chapter 60 of the Kansas Statutes Annotated, any civil action brought by, or on behalf of, the Kansas public employees retirement system shall be brought within 10 years of the time in which such cause of action shall have accrued.

"(b) The provisions of this section shall be part of and supplemental to the provisions of article 5 of chapter 60 of the Kansas Statutes Annotated."

This provision appears to have been enacted as a part of the recommendation of the Report to the 1992 Kansas Legislature by the Joint Committee on Kansas Public Employees Retirement System (KPERS) Investment Practices, p. 46, paragraph 8, which states:

"Extension of the Statute of Limitations. The Joint Committee recommends legislation that would extend for a period of ten years to the statute of limitations on civil and criminal matters where KPERS is the alleged victim. The extension would apply only if the statute of limitations has not already expired."

What the 1992 Kansas Legislature did was grant to all parties that may be sued by KPERS for claims arising from a governmental function a 10-year period of limitations where none had previously existed. As such, the provision does not violate the Equal Protection or Due Process Clauses of either the United States or Kansas Constitutions. The provision did not violate any existing rights because none in fact existed, and it certainly forms no basis for a discrimination claim.

All of the arguments made by the defendants as to the validity of these provisions are premised on our holding KPERS's actions to be proprietary. Because we declined to do so, they are left without any arguments which require our consideration, except for the claimed violation of Article 2, § 16 of the Kansas Constitution, which we will shortly address.

We said in *State ex rel. Stephan v. GAF Corp.*, 242 Kan. 152, 162-63, 747 P.2d 1326 (1987): "Statutes of limitation are measures

of public policy and are entirely subject to the will of the legislature." Accord *State v. Bentley*, 239 Kan. 334, 339, 721 P.2d 227 (1986); *State v. Mills*, 238 Kan. 189, 191, 707 P.2d 1079 (1985). K.S.A. 60-522 clearly stated the public policy of the State of Kansas, and while its enactment may not have been necessary to see that public policy fulfilled, in light of our holding herein, it was certainly not unconstitutional.

The legislative history is clear that the 1993 Kansas Legislature wished to be certain that K.S.A. 60-522 would be construed to act retroactively, so it adopted the present subsection (c), which reads as follows: "The limitations set forth in subsection (a) are to be construed and applied retroactively."

The Minutes of the Senate Committee on Ways and Means on April 2, 1993, state:

"KPERS INVESTMENT/OTHER CHANGES

"Senator Rock queried whether the statute of limitations could be applied retroactively (item 3, Attachment 1-21). Meredith Williams, Executive Director of KPERS, stated that the retroactive issue is in court and the recommendation was made because the KPERS Board of Trustees requested clarification of legislative intent in 1992 HB 2096."

The supplemental notes on Substitute for H.B. 2211, as it was amended by the House Committee on Appropriations and the Senate Committee on Appropriations, both state:

"3. CIVIL ACTIONS STATUTE OF LIMITATIONS. Clarify that the ten-year statute of limitations for civil actions brought by on or behalf of KPERS as provided by 1992 H.B. 2096 is to be applied retroactively."

The legislative intent is clear. The legislature intended K.S.A. 60-522 to be applied retroactively, and we hold it should be so applied. We will not enter into a discussion of the application of *Harding v. K.C. Wall Products, Inc.*, 250 Kan. 655, 831 P.2d 958 (1992), on this issue as the Eighth Circuit did in *Home Savings*, other than to hold we disapprove of the result reached in *Home Savings*.

*Harding* is instructive in that it discusses *Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 89 L. Ed. 1628, 65 S. Ct. 1137, *reh. denied* 325 U.S. 896 (1945), and notes:

"The Court stated '[s]tatutes of limitations find their justification in necessity and convenience rather than in logic' representing expedients rather than principles. 325 U.S. at 314. The Court found they are for the practical purpose of sparing the courts from litigation of stale claims and people from being put to the defense of claims after memories have faded and witnesses have disappeared. The Court further stated statutes of limitations are arbitrary, do not discriminate between just and unjust claims, and are creatures of the legislature and not the judiciary, expressing public policy on the right to litigate. The shelter afforded by the running of the statutes of limitations does not amount to a fundamental right and the defense is subject to a large degree of legislative control." 250 Kan. at 667.

The issues involving the constitutionality and retroactivity of 60-522 have been briefed and argued to us based on an entirely different expected result of the governmental-proprietary issue. However, having resolved that issue as we have, the defendants do not lose any rights by the enactment of K.S.A. 60-522 and gain a possible defense. As such, we are hard pressed to see how they can have any complaints about the enactment of this provision and its amendment.

Finally, K.S.A. 60-522(c) does not violate Article 2, § 16 of the Kansas Constitution. This court, heeding the directive that § 16 be "liberally construed to effectuate the acts of the legislature," has held that "[a] court should not declare a statute violative of Article 2, Section 16, of the Constitution of the State of Kansas unless invalidity is manifest." *State v. Roseberry*, 222 Kan. 715, 717, 567 P.2d 883 (1977). Legislation is valid under § 16 so long as the provisions of the bill "are all germane to the subject expressed in the title." 222 Kan. at 716. Kansas courts will invalidate duly enacted legislation "only where an act embraces two or more dissimilar and discordant subjects that cannot reasonably be considered as having any legitimate connection with or relationship to each other." *Harding*, 250 Kan. at 671 (quoting *State v. Reves*, 233 Kan. 972, Syl. ¶ 1, 666 P.2d 1190 [1983]).

1993 H.B. 2211 meets this test. All of its provisions are germane to one subject: KPERS. Defendants' suggestion that the Kansas Legislature conspired to surreptitiously pass a bill with provisions otherwise unrelated to aspects of KPERS and its statute of limitations is unwarranted. As this court explained in *State ex rel. Ste-*

*phan v. Thiessen*, 228 Kan. 136, 612 P.2d 172 (1980), a case upon which defendants rely:

"'[T]he title of an act may be as broad and comprehensive as the legislature may choose to make it; . . . . It may be so broad and comprehensive as to include innumerable minor subjects provided all these minor subjects are capable of being so combined and united as to form only one grand and comprehensive subject.'" 228 Kan. at 143 (quoting *State v. Barrett*, 27 Kan. 213 [1882]).

Statutes of limitations are frequently among those "innumerable minor subjects" that are properly included in a broad and comprehensive bill. In *Harding*, 250 Kan. at 671-72, we found it proper for the legislature to have included a statute of limitations relating to latent diseases in a broader act relating to products liability. In *Hiett v. Brier*, 2 Kan. App. 2d 610, 586 P.2d 55, *rev. denied* 225 Kan. 844 (1978), the Court of Appeals held that a general bill relating to elections which included a period of limitations requiring that mandamus and injunction proceedings be brought no less than 30 days before the election being challenged satisfied § 16.

Only defendants Baum, Thomas, and G.B.K., Inc., allege one further ground for unconstitutionality, which is that the statute violates Article 12, § 1, of the Kansas Constitution, which bars the legislature from passing special acts conferring corporate powers. They cite no good authority that this article makes K.S.A 60-522 unconstitutional. This issue has no merit.

Although our analysis of K.S.A. 60-522 may differ from that of the trial court, we agree that the provision is constitutional and may be retroactively applied.

*Government employees*

In light of everything we have previously said, resolution of this issue as KPERS requests would only show another reason why the denial of summary judgment was proper. Based on our holdings herein, the provision of K.S.A. 60-521 exempting claims against governmental employees from statutes of limitation would have no effect on the decision we reach.

Finally, we decline to comment on any other issues raised because we accepted jurisdiction of this appeal pursuant to K.S.A. 60-2102(b), which reads:

"When a district judge, in making in a civil action an order not otherwise appealable under this section, is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the judge shall so state in writing in such order."

In its decision below, the trial court found:

"[T]hese issues concerning the applicability of K.S.A. 60-522 (1993) and K.S.A. 60-521 to the claims in these proceedings involve controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from such orders and judgments may materially advance the ultimate termination of these and other like cases."

The other issues raised by various defendants involving whether KPERS has stated a claim sounding in tort or in contract were not certified to this court. We have no jurisdiction to decide these issues on appeal.

In addition, any other issues reached by the trial court as an additional ground in support of its ruling need not be addressed on appeal.

We have considered all of the arguments raised by all parties herein, whether specifically discussed or not, and hold that none affect our decision.

The trial court is affirmed.